SO ORDERED.

SIGNED April 20, 2023.



_____
**JOHN W. KOLWE**
**UNITED STATES BANKRUPTCY JUDGE**

_____

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | |
|---|---|
| In re: <br> Ronald Leebert Fontenot <br> *Debtors* | Case No. 20-50588 |
| David W. Asbach, Acting United States Trustee <br> *Plaintiff* <br><br> v. <br><br> Ronald Leebert Fontenot <br> *Defendants* | Chapter 7 <br><br> Judge John W. Kolwe <br><br> Adv. Proc. No. 21-5015 |

### MEMORANDUM RULING

The Acting U.S. Trustee, David W. Asbach ("UST"), filed this adversary proceeding against the Debtor, Ronald Leebert Fontenot, seeking to revoke the Debtor's discharge under 11 U.S.C. §§ 727(d)(1) and 727(d)(2). The UST claims the Debtor intentionally and fraudulently failed to schedule certain valuable assets and also provided misleading testimony during his meeting of creditors concerning his assets. The Debtor denies that he acted fraudulently. This matter came before the Court for trial on December 8, 2022, during which the Trustee introduced nearly 3,000 pages of exhibits and took the testimony of two witnesses: Lucy Sikes ("Sikes"),

the Chapter 7 Trustee in the Debtor's underlying bankruptcy case, and the Debtor himself. The Debtor did not introduce any additional exhibits or call additional witnesses. The Court took the matter under advisement at the conclusion of the trial, and now rules as follows.

## Procedural History and Background

The Debtor was involved in two recent bankruptcy cases in this Court. The first was his individual chapter 7 case, which was filed on July 31, 2020. His meeting of creditors was held on September 11, 2020, and he received a discharge on November 17, 2020. The second was for his 100% owned company, Fontenot's Diesel Performance, LLC ("Diesel Performance"), which was filed on August 26, 2021. The second case is relevant here because the UST claims that it was not until the October 7, 2021, meeting of creditors in that case that anyone suspected that the Debtor's schedules in his individual case may have omitted certain valuable assets.

Following the meeting of creditors in the Diesel Performance case, the UST engaged in an investigation of the Debtor that culminated in him filing this action on November 8, 2021, seeking to revoke the Debtor's discharge. The UST claims that its investigation, coupled with discovery in this case, reveal that the Debtor engaged in fraudulent conduct during his individual Chapter 7 case that was aimed at hiding most of his valuable assets from the Chapter 7 Trustee and the Debtor's creditors (the undisclosed assets include interests in wholly owned companies, a motorcycle and a personal injury settlement, among others). He also failed to disclose all of his income. The UST urges that the Debtor's omissions of assets and income from his schedules and his evasions throughout his bankruptcy case show the requisite fraudulent intent to require revocation of the Debtor's discharge under §§ 727(a)(1) and 727(a)(2).

For the most part, the Debtor admits that he did not disclose certain assets, or fully report all of his income, but denies the omissions were made willfully or fraudulently. He claims the omissions were due to either honest mistakes or his misunderstanding of how the bankruptcy process works. His position is slightly different with respect to the unreported cash income. He claims that his cash income

is not generated from "recordable" business activities because he does not generate any invoices for the provided services. Finally, the Debtor argues that his discharge should not be revoked because the creditors were not harmed. According to the Debtor, creditors will receive a dividend in his individual case that is at least equal to what they would have received if he had fully scheduled the omitted assets.

The question before the Court, however, is not what the creditors would have received had the Debtor fully disclosed his assets and been forthcoming during his meeting of creditors. Rather, the Court is charged with determining whether the Debtor acted with fraudulent intent with respect to these matters. On that question, the Court has carefully considered the documentary evidence, the testimony of the witnesses, and the parties' pretrial stipulations and briefing, and finds that the Debtor intentionally left many of his most valuable assets out of his schedules for the purpose of preventing his creditors in general and his ex-wife specifically from obtaining the bulk of his property. Additionally, the Court finds that the omissions and evasions were so pervasive that it is unlikely the Debtor would have received a discharge had the true nature of the Debtor's finances been disclosed prior to his receiving a discharge. Thus, the Court will enter judgment for the UST revoking the Debtor's discharge.

## **Applicable Law**[1]

The grounds for revoking a discharge are set forth in §§ 727(d)(1) and 727(d)(2), which provide:

> (d) On request of the trustee, a creditor, or the United States trustee, and after notice and a hearing, the court shall revoke a discharge granted under subsection (a) of this section if--
> (1) such discharge was obtained through the fraud of the debtor, and the requesting party did not know of such fraud until after the granting of such discharge;
> (2) the debtor acquired property that is property of the estate, or became entitled to acquire property

---

[1] The Court has jurisdiction over this core matter pursuant to 28 U.S.C. § 157(b)(2)(J), 28 U.S.C. § 1334(a), and Fed. R. Bankr. P. 7001(4), and venue is proper in this district under 28 U.S.C. §§ 1408 and 1409(a).

that would be property of the estate, and knowingly and fraudulently failed to report the acquisition of or entitlement to such property, or to deliver or surrender such property to the trustee;[2]

To revoke a discharge under § 727(d)(1), two requirements generally must be established. First, it must be shown that the discharge "was obtained through the fraud of the debtor."[3] "This language requires, at a minimum, that the discharge would not have been granted but for the fraud alleged."[4] Moreover, "the fraud required to be shown is fraud in fact, such as the intentional omission of assets from the debtor's schedules" or some other "intentional wrong, and does not include implied fraud or fraud in law, which may exist without the imputation of bad faith or immorality."[5] "To find the requisite degree of fraudulent intent, the court must find the debtor knowingly intended to defraud the trustee, or engaged in such reckless behavior as to justify the finding of fraud."[6] The bankruptcy court's finding of fraudulent intent may also be based on inferences drawn from a course of conduct.[7] Additionally, fraudulent intent may be inferred from all of the surrounding circumstances. The second requirement under § 727(d)(1) is that party requesting revocation of the discharge must not have known of the Debtor's fraud until after the granting of the discharge.[8]

Turning to § 727(d)(2), this provision authorizes the court to revoke a discharge if the debtor acquired property that is property of the estate, or became entitled to acquire property that would be property of the estate, and knowingly and fraudulently failed to report the acquisition of or entitlement to the property, or to deliver or surrender the property to the trustee. "This provision imposes a duty upon

---

[2] 11 U.S.C. § 727(d)(a) and (2).
[3] § 727(a)(1).
[4] 6 COLLIER ON BANKRUPTCY ¶ 727.17[2] (Richard Levin & Henry J. Sommer eds., 16th ed.).
[5] *Id.*
[6] *In re Yonikus*, 974 F.2d 901, 905 (7th Cir. 1992).
[7] *In re Devers,* 759 F.2d 751, 753-754 (9th Cir. 1985); *Farmers Co-op. Ass'n of Talmage, Kan. v. Strunk,* 671 F.2d 391, 395 (10th Cir. 1982); *In re Kindorf,* 105 B.R. 685, 690 (Bankr. M.D. Fla. 1989); *see also Matter of Reed,* 700 F.2d 986, 991 (5th Cir. 1983) (The debtor's "whole pattern of conduct" supports the bankruptcy court's finding of fraudulent intent).
[8] 11 U.S.C. § 727(d)(1).

4

the debtor to report to the trustee any acquisitions of property after the filing of the petition."[9] "Debtors have an absolute duty to report whatever interests they hold in property, even if they believe their assets are worthless or are unavailable to the bankruptcy estate."[10]

Finally, in an action to revoke a discharge, the plaintiff has the burden of proving sufficient facts to sustain his claims by a preponderance of the evidence.[11]

## Analysis

A central purpose of the Bankruptcy Code is to provide a process by which "debtors can reorder their affairs, make peace with their creditors," and obtain a "fresh start"—i.e., "'a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.'"[12] For those debtors seeking to take advantage of the benefits of the Code, it is imperative that they be open and honest with the trustee, creditors, and ultimately the Court. As the Supreme Court has noted, the "fresh start" policy of the Code "limits the opportunity for a completely unencumbered new beginning to the 'honest but unfortunate debtor.'"[13]

Debtors are repeatedly reminded of their need to be honest and forthcoming with respect to their assets, liabilities and other affairs at the inception of their case. The Bankruptcy Official Forms, including the Voluntary Petition for Individuals Filing Bankruptcy, the Declaration About an Individual Debtor's Schedules and the Statement of Financial Affairs ("SOFA"), include declarations just above where the debtor signs each of those forms that provides: "I declare under penalty of perjury that the information provided is true and correct."[14] By signing the Voluntary

---

[9] 6 COLLIER ON BANKRUPTCY ¶ 727.17[4] (Richard Levin & Henry J. Sommer eds., 16th ed.).
[10] *In re Yonikus*, 974 F.2d at 901; *In re Magnuson,* 113 Bankr. 555, 559 (Bankr. D.N.D. 1989) (citing *In re Gugliada,* 20 Bankr. 524, 528 (Bankr. S.D.N.Y. 1982) and *In re Watkins,* 84 B.R. 246, 250 (Bankr. S.D. Fla. 1988)).
[11] *See Beauboeuf v. Beaubouef (In re Beaubouef),* 966 F.2d 174 (5th Cir. 1992); *In re Slack*, 143 Fed.Appx. 628, 629 (5th Cir. 2015).
[12] *Grogan v. Garner,* 498 U.S. 279, 286–87, 111 S. Ct. 654, 659, 112 L. Ed. 2d 755 (1991), citing *Local Loan Co. v. Hunt,* 292 U.S. 234, 244, 54 S. Ct. 695, 699, 78 L. Ed. 1230 (1934).
[13] *Id.*
[14] *See* Official Form 101, Official Form 106Dec and Official Form 107, respectively.

Petition, debtors also acknowledge that "making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $250,000, or imprisonment for up to 20 years, or both."[15]

Turning to this case, the Debtor signed the Voluntary Petition, the Declaration and the SOFA[16] thereby attesting that his Schedules and SOFA presented an accurate depiction of his finances. Moreover, he confirmed at his September 11, 2020 meeting of creditors that he had read the bankruptcy filings before signing them under penalty of perjury. He further testified that the information in the schedules and related documents was true and correct,[17] he had listed all of his assets on his schedules,[18] he had left nothing out of his bankruptcy filings except for "a few" creditors, perhaps up to five (which he corrected through amendment),[19] and he did not have any cash in his possession or control.[20] Based on the disclosures in the Schedules and the Debtor's sworn testimony at the meeting of creditors, he seems to fit the definition of the "honest but unfortunate debtor" entitled to the benefits of the bankruptcy process.

The evidence in this case, however, paints a different picture. It shows that the Debtor omitted many significant assets from his Schedules, including: his 100% ownership interest in two companies, namely Fontenot Diesel Enterprises, LLC and Fontenot's Towing and Recovery, LLC; a 2011 Harley Davidson motorcycle; the proceeds from the settlement of a personal injury claim; a $30,000 "Dyno" machine; digital assets, including accounts with PayPal, Venmo, and CashApp; and cash holdings. Moreover, the Debtor's income, as reflected in his schedules, is also understated, as he testified that he earned substantial cash income of anywhere from

---

[15] Official Form 101.
[16] *See* Tr. Ex. 1 (ECF #26-1).
[17] *See* Transcript of § 341 Meeting, Tr. Ex. 3, p. 3 (ECF #26-3). NB: The U.S. Trustee's PPFCL cites to the page number from the CM/ECF numbering of the transcript, but the Court will use the pagination from the actual transcript, and the Court will use the convention of citing to an exhibit's independent pagination for any other document cited herein unless otherwise noted. Consequently, the pagination in the Court's citation will differ from time to time from the U.S. Trustee's pagination.
[18] *Id.*
[19] *Id.* at p. 4.
[20] *Id.* at p. 12.

$500 to $5,000 per month that he did not schedule because he did not invoice for the services provided, and thus did not keep a record of those transactions.

The fact that the Debtor omitted the identified property and income from his schedules is not subject to serious dispute. Thus, the fundamental question before the Court is whether the Debtor *intended* to omit those items from his schedules in order to conceal, hinder, delay, or defraud the Chapter 7 Trustee and his creditors, as asserted by the UST. The Court finds that he did. While the totality of the evidence overwhelmingly supports this conclusion, the Court will focus on the circumstances surrounding the omission of the following assets from the Debtor's schedules: Fontenot Diesel Enterprises, LLC ("Diesel Enterprises"), a 2011 Harley Davidson, and the proceeds from the settlement of a personal injury claim. That discussion will be followed by a brief examination of the other evidence supporting the Court's conclusion.

### *Fontenot Diesel Enterprises, LLC*

The entity, "Fontenot Diesel Enterprises, LLC" does not appear anywhere in the Debtor's schedules, However, he did disclose his ownership of a different company, Diesel Performance, which he valued at $100. He testified during the meeting of creditors in his individual case that he was the sole owner of the company. He further testified that the company was performing poorly and was heavily in debt, and that he was likely to place it into Chapter 7 in the near future. In fact, Diesel Performance filed a Chapter 7 proceeding on August 26, 2021.

As previously noted, it was during the meeting of creditors in the Diesel Performance case when it first came to light that the Debtor had failed to disclose certain assets in his individual case, including his ownership of Diesel Enterprises. The Debtor claims that his failure to schedule Diesel Enterprises is harmless because he did not begin operations in that entity until January 1, 2021, which is after the petition date in his individual case, and after he received a discharge. Indeed, the Debtor previously represented to this Court, in opposition to the Chapter 7 Trustee's Motion to liquidate Diesel Enterprises, which was filed in his individual bankruptcy

case (Case No. 20-50588), that "on July 31, 2020 [the date of the Debtor's individual case], ***Fontenot's Diesel Enterprises, LLC had no assets and conducted no business. It was a dormant entity.***"[21]

These assertions by the Debtor are belied by the evidence before the Court showing that Diesel Enterprises was an active going concern as of July 31, 2020. The evidence shows that the Debtor created Diesel Enterprises in September 2019.[22] It also shows that in October 2019, nearly ten months before the Debtor filed his individual bankruptcy, a bank account was opened at Capital One Bank in the name of Diesel Enterprises. The bank statements for this account show deposits exceeding $100,000 from the time the account was opened until the Debtor filed his individual bankruptcy case, and over $129,000 in deposits post-petition. The evidence also shows that around the time of formation, Diesel Enterprises amassed equipment valued in excess of $300,000, and the Debtor admitted that he paid cash for the majority of this equipment, although the evidence shows that approximately $50,000 in new equipment may have been financed.

Significantly, around the same time the Capital One account was opened for Diesel Enterprises, an account at Basile State Bank, in the name of Diesel Performance, was closed. And there is no documentary evidence before the Court showing that the Debtor conducted any business in the name of Diesel Performance after its bank account was closed in 2019. Thus, contrary to the Debtor's assertions, Performance Enterprises—his wholly owned entity that he omitted from the schedules in his individual case—is the only company that appears to have been conducting business at the time he filed his individual case. By the same token, Diesel Performance—the only disclosed entity—appears to have been defunct, and but a shell, at the time he filed his individual case. These facts are essentially the opposite of what the Debtor represented in the schedules of his individual case, during his meeting of creditors, and even at the trial of this matter.

---

[21] Case No. 20-50588 (Fontenot's Individual Chapter 7 Case), Objection to Trustee's Motion to Authorize Liquidation of LLC (ECF # 40), ¶¶ 3-4 (emphasis added).

[22] *See* Louisiana Secretary of State Record showing that Fontenot's Diesel Enterprises, LLC was registered on September 12, 2019, Tr. Ex. 9(1-B) (ECF #26-9).

8

Faced with this evidence, the Debtor became hostile and evasive during trial, finally claiming in his trial testimony that none of his transactions involving his disclosed but defunct business, Diesel Performance, and his undisclosed but operational business, Diesel Enterprises, were relevant to his personal bankruptcy. The Debtor is wrong. Numerous bankruptcy courts, including this one, have held that "where a debtor has a membership interest in a single-member LLC and files a petition for bankruptcy under Chapter 7, the Chapter 7 trustee succeeds to all of the debtor's rights, including the right to control that entity, and a trustee need not take any further action to comply with state law before exercising such control."[23] Moreover, the rights of the Trustee include "all governance of that entity, including decisions regarding liquidation of the entity's assets."[24] Thus, had the debtor been forthcoming in his disclosures, it is certainly possible the Chapter 7 Trustee could have monetized the value of Diesel Enterprises for the benefit of the creditors in the Debtor's individual case.

Finally, and notwithstanding the evasiveness of the Debtor's testimony, he testified that his primary intent in forming Diesel Enterprises was to shield his assets from his ex-wife, a scheduled creditor in this matter, as he stated that Diesel Enterprises was formed after his divorce, when his wife was threatening to take all of his assets. In shielding his assets from his ex-wife, he necessarily was also shielding them from all of his creditors.

In summary, the evidence overwhelming shows that the Debtor formed Diesel Enterprises nearly 10 months before he filed his individual case, and for this reason alone, it should have been disclosed in the schedules, regardless of whether it was actually operating or owned any assets.[25] Most significantly, however, is that the

---

[23] *In re Cleveland*, 519 B.R. 304, 306–07 (D. Nev. 2014); *see also In re First Protection, Inc.,* 440 B.R. 821, 830 (9th Cir. BAP 2010); *In re B & M Land & Livestock, LLC,* 498 B.R. 262, 267 (Bankr.D.Nev.2013); *In re Albright,* 291 B.R. 538, 541 (Bankr.D.Colo.2003). This Court reached a similar conclusion in *In re Duplechin,* a case in which the court allowed the Chapter 7 Trustee to assume control over the Debtor's wholly owned LLC and liquidate it.

[24] *In re Albright,* 291 B.R. 538, 541 (Bankr.D.Colo.2003).

[25] If property is not properly scheduled by the debtor, it is not automatically abandoned at the end of the case. *See* 5 COLLIER ON BANKRUPTCY ¶ 554.03 (Richard Levin & Henry J. Sommer eds., 16th ed.); 11 U.S.C. §§ 554 (c) and 554(d).

evidence here shows that the Debtor's assertions to this Court, that Diesel Enterprises was but a shell company with no value at the time he filed bankruptcy, are false. The company owned assets and was operational. The only reasonable explanation for the Debtor not disclosing it is that he wanted to shield this asset from his creditors, especially his ex-wife. Accordingly, the UST has carried his burden of showing that the Debtor intended to omit Diesel Enterprises from his schedules. This finding alone is sufficient to show the debtor acted fraudulently in omitting assets from his schedules, but there is more.

### *The Harley-Davidson Motorcycle*

The Debtor's schedules make no mention of a Harley-Davidson motorcycle. Nor does the Debtor's Statement of Financial Affairs disclose the sale of a Harley-Davidson in the two-year look-back period running from the petition date. However, prior to the Debtor's meeting of creditors, the Chapter 7 Trustee determined that a 2011 Harley-Davidson was titled in the Debtor's name.[26] The Trustee asked the Debtor during the creditors' meeting if he had a 2011 Harley-Davidson motorcycle.[27] He stated, "No," but admitted he owned it at one time.[28] Ms. Sikes then questioned the Debtor regarding the disposition of the motorcycle:

> **Q** What happened to it?
> **A** Well, well, a guy, a guy had bought it from me. This was -- I don't even know. Umm. I don't even remember. I don't remember the exact date. But I --I -- the only thing I think he did is he still never just transferred the title.
> **Q** Uh-huh (indicating an affirmative response).
> **A** But it was signed over to him. I think the title, the title may still be in my name I'd have to actually pull the VIN.
> **Q** Do you have a bill of sale?

---

[26] Ms. Sikes testified during the trial of this matter that she routinely runs reports to determine whether a debtor owns vehicles that may not have been disclosed in the debtor's schedules. This is how she discovered that the Debtor here still had record title to a 2011 Harley-Davidson.

[27] The Transcript of Telephonic 341 Meeting of Creditors was admitted into evidence as Tr. Ex. #3 (ECF #26-3). This exchange can be found at ECF # 26-3, p. 14, lines 7-8.

[28] *Id.*, line 9.

10

> **A** But I think the title is still in my name 'cause he never, he never transferred it. But it's like signed over to him with a bill of sale and everything.
> **Q** Okay. You can send me a copy of the bill of sale?
> **A** Yes, I can.
> **Q** Okay.
> **A** I can get that to Mr. Keating.
> **Q** Okay.[29]

On September 18, 2020, one week after the meeting of creditors in the Debtor's individual case, the Chapter 7 Trustee requested the bill of sale evidencing the sale of the motorcycle from Debtor's counsel. On the same day, Debtor's counsel forwarded the bill of sale to Ms. Sikes, indicating that he had just received it.[30] The Bill of Sale is dated June 20, 2020, and shows that the 2011 Harley-Davidson was purchased by Christopher Arnaud from the Debtor for $7,500.[31] The Bill of Sale appears to corroborate the Debtor's statements during the meeting of creditors that he had sold the motorcycle prior to case filing, and perhaps the title had not been updated. Given this disclosure, Ms. Sikes did not take any further action with respect to the motorcycle.

The trial evidence tells a different story, however. The UST presented evidence showing that the Debtor delivered the motorcycle to Cajun Harley-Davidson for repairs on July 20, 2020, just 10 days before he filed his individual bankruptcy case.[32] When asked during trial to reconcile the document he provided to the Chapter 7 Trustee, showing that the motorcycle had been sold by him, with the evidence showing he still possessed the bike days before his bankruptcy filing, and even as of the date of his meeting of creditors, the Debtor changed his story, claiming he had "pre-sold" the motorcycle on June 20, 2020 and promised Mr. Arnaud he would make some repairs. He testified that he brought the motorcycle to the Harley-Davidson dealer for approximately $1,200 in repairs in July 2020. He then claimed that the

---

[29] *Id.* at p. 14 line 9 through p. 15 line 3.
[30] *See* the email exchange between Ms. Sikes and Mr. Keating, Tr. Ex. # 18 (ECF 29-1).
[31] Tr. Ex. # 8 (ECF # 26-8).
[32] *See* Work Order Reprint from Cajun Harley-Davidson, Tr. Ex. 9(2), pp. 1-2 (ECF #26-9), showing $1,204.00 in repairs.

11

purported purchaser, Mr. Arnaud (who was never listed on the Debtor's schedules and whose contact information was never provided to anyone), failed to pay him for the motorcycle, so he went and picked up the motorcycle from his house (although at trial the Debtor could not remember where Mr. Arnaud lived).

The story continues: The evidence shows the motorcycle was traded to Cajun Harley-Davidson on September 16, 2020, for an $8,500 trade-in credit on a 2018 motorcycle. This document also shows that the motorcycle was not traded by the Debtor, but *by Diesel Enterprises* (the company discussed above that the Debtor claims was dormant and worth zero until January 1, 2021), with Diesel Enterprises also making a down payment of $4,592.56 on a motorcycle with a purchase price exceeding $30,000.[33] Incredibly, the Debtor's trade-in of the motorcycle occurred within days of his testimony that he had sold the bike to Mr. Arnaud, and within days of his providing the bill of sale to the Chapter 7 Trustee purporting to show the sale to Mr. Arnaud on June 20, 2020.

When questioned at trial about the trade-in of the motorcycle, the Debtor acknowledged that he should have disclosed those things, but his answers to specific questions were often evasive, argumentative, or outright hostile. The Debtor repeatedly tried to shut down lines of questioning because, in his view, he had already acknowledged that he had made mistakes.

The Court rejects the Debtor's contentions that his omission of the true disposition of the Harley-Davidson was merely the product of a mistake, as the evidence shows he owned the bike, and was working to trade it in, while at the same time representing to the Trustee that he no longer possessed it because he had sold it prepetition. The fact that the Debtor used his undisclosed entity, Diesel Enterprises, for the trade-in and purchase of the new bike is further evidence showing the Debtor intended to shield this asset from his creditors.

---

[33] *See* Cajun Harley-Davidson Bill of Sale dated September 16, 2020, Tr. Ex. 9(1-B) (ECF #26-9).

## The Proceeds of the Personal Injury Settlement

The Debtor was in an accident on July 29, 2020, the day before he filed his Chapter 7 petition, thereby making all claims arising out the accident property of the bankruptcy estate. The potential claim arising from the accident was disclosed in the Debtor's schedules. The Chapter 7 Trustee inquired about the accident during the meeting of creditors in the Debtor's individual case, asking whether he was making a claim for personal injuries. The Debtor's attorney jumped in to answer the question, stating that the Debtor was "not making a claim for personal injuries" because "he wasn't hurt."[34] The Debtor confirmed these statements by his attorney; he further stated that his truck was financed with Ford Motor Credit, and he was only looking to have his vehicle paid off.

Notwithstanding the Debtor's affirmative representations during his creditors' meeting that he was only seeking property damages as a result of the accident, the evidence shows the Debtor settled a personal injury claim relating to his pre-petition traffic collision on December 18, 2020, a mere three months after he testified he was not pursuing such a claim. The settlement was for $25,000, with the Debtor receiving a lesser portion of that after accounting for attorney's fees and other expenses.[35]

The Court finds that either the Debtor provided misleading testimony at his meeting of creditors with respect to whether he would be pursuing a personal injury claim, or he later learned that he was injured and then decided to pursue such a claim without letting the Trustee know of his change in circumstances. Either way, the personal injury claim was property of the estate, and the Debtor was under an obligation to tender any settlement proceeds he received to the Trustee.[36] The Court finds that his failure to do so was not the product of a mistake or a misunderstanding, and that he obviously intended to keep the proceeds from the settlement for his own personal use and enjoyment.

---

[34] *See* Transcript of Telephonic 341 Meeting of Creditors, Tr. Ex. #3 pp. 9-10 (ECF #26-3).
[35] *See* Trustee's Motion to Approve Settlement and Attached Documents, Tr. Ex. 6 (ECF #26-6).
[36] *See* 11 U.S.C. § 727(d)(2).

13

*Other Matters*

Remarkably, the above three matters are not the Debtor's only egregious failures, and the Court will briefly address some of the others to suggest the breadth of his misconduct in bankruptcy.

On November 17, 2020, the Debtor caused Diesel Enterprises (the undisclosed entity) to purchase a 2019 Ford F450 Super Duty truck for $89,189.00 from South Car Motorsports, which according to the Buyer's Order was paid at the time of the purchase.[37] As the UST points out, the Capital One Bank records for the Debtor's personal account show that the Debtor paid South Car Motorsports $20,000 from his own account in the month prior to the purchase, and at trial he was unable to explain how he was able to come up with $20,000 post-petition in October 2020 when he claimed to have no cash on the petition date,[38] nor was he able to explain how he was able to pay nearly $90,000 cash overall for the truck.

When questioned about the purchase of the truck at trial, the Debtor's testimony made no sense. First, he claimed that his uncle (whose last name he claimed he could not spell) had financed the purchase with a $20,000 check to the dealership, but he offered no evidence of that. He also claimed that his personal injury attorney had paid some of the purchase price on his credit card, a fact the Court finds unbelievable, particularly given the lack of any supporting evidence. In short, the Debtor failed to provide any reasonable explanation as to how he was able to cause Diesel Enterprises to pay nearly $90,000 for a truck in November 2020, including apparently $20,000 in the Debtor's personal money, at a time when the Debtor claimed he was completely insolvent with no cash on hand, and Diesel Enterprises was dormant. The Court finds the Debtor's testimony to be incredible, and the Court concludes that the Debtor's failure to disclose either the purchase or the money used in the purchase was done with fraudulent intent.

---

[37] *See* South Car Motorsports Buyer's Order, Tr. Ex. 13, CM/ECF p. 11 of 224, (ECF #26-13).
[38] *See* Capital One Bank Records, Tr. Ex. 5, CM/ECF pp. 507, 509, 510, 512 (ECF #26-5).

Additionally, the evidence shows that the Debtor's other wholly owned, but undisclosed company, Fontenot's Towing and Recovery, LLC, may have had value to his estate because it owned a tow truck. Similarly, the Debtor testified that he also owned a "Dyno" machine, valued at $30,000, that was not scheduled. With respect to this machine, the Debtor later claimed it was leased, not owned, but he presented no evidence showing it had been leased.

Finally, the Debtor also testified at the Diesel Performance meeting of creditors and in his deposition that he takes on a lot of jobs for cash, including selling tuning files and tuning off-road equipment, earning between $500.00 and $5,000.00 per month in undisclosed income. Problematically, while the Debtor finally admitted that he kept cash on hand, he testified that he did not deposit the cash into a bank account because "it is not a recordable business," but he was evasive when questioned about where he kept the cash. He also admitted that he owned accounts with PayPal, Venmo, and Cash App which had not been disclosed in his schedules.

In summary, nothing in the record suggests that the Debtor's failure to disclose the assets identified above, and his misleading testimony concerning his assets during his meeting of creditors, was inadvertent or innocent. Nor do his actions fit that of the proverbial "honest but unfortunate debtor." Simply put, the evidence overwhelmingly supports the Court's finding that the Debtor's inadequate disclosures and misleading testimony during his meeting of creditors are consistent only with fraudulent intent.

The issue now becomes, for purposes of § 727(d)(1), whether the Debtor's fraud was known to the requesting party—the Acting United Stated Trustee. There is nothing in the record of this matter showing the UST knew of the Debtor's fraudulent conduct prior to the Debtor receiving his discharge. The Chapter 7 Trustee confirmed during her trial testimony that she did not learn of the omissions and misrepresentations by the Debtor until after the meeting of creditors in the Diesel Performance case, which was approximately 10 months after the Debtor had received his discharge. Moreover, the record of this matter shows the Debtor was actively attempting to shield his assets. Thus, the Court finds that neither the UST, nor the

15

Chapter 7 Trustee, knew of the Debtor's fraudulent conduct until after he received his discharge.

## Conclusion

Fundamentally, the Court's inquiry in this case is straightforward. First, did the Debtor fail to disclose the existence of material assets and/or transfers or make material misstatements about those assets and/or transfers? The record evidence in this case overwhelmingly proves that the Debtor made numerous false statements and material omissions both in his bankruptcy filings and at the § 341 meeting of creditors.

Second, did the Debtor act with fraudulent intent to obtain the discharge? Specifically, did the Debtor knowingly intend to defraud the Trustee or creditors, or was his behavior sufficiently reckless to justify a finding of fraud? The Court concludes that the vast scope of the Debtor's omissions and false statements, both in number and materiality, as well as the Debtor's consistently evasive, misleading, and incredible responses when directly questioned about various assets and transactions, amply support a finding that the Debtor acted with fraudulent intent.

In short, all of the Debtor's omissions and false statements in this case were egregious and material, and the Court finds that the Debtor acted fraudulently, i.e., with actual intent to hinder, delay, or defraud creditors and/or the Chapter 7 Trustee. Given the overwhelming record evidence and this Court's own credibility determinations of the trial testimony, the Court concludes that the U.S. Trustee has carried his burden of proving that the Debtor's discharge should be revoked under § 727(d)(1) and § 727(d)(2) as prayed for.